T.C. Memo. 2000-332

UNITED STATES TAX COURT

HERBERT L. MITCHELL, DECEASED, AND ELLA MARIE MITCHELL,
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15953-95.                    Filed October 26, 2000.

<u>John D. Steffan</u>, for petitioners.

<u>Alan R. Peregoy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency of $268,376 in petitioners' Federal income taxes for 1991 and, by amendment to answer, asserted an increase in the deficiency of $988, for a total of $269,364.  We must decide whether petitioner Ella Marie Mitchell (petitioner) is entitled to relief from liability for

the deficiency under the provisions of section 6015(b), (c), or (f).[1]

The sole assignment of error in the petition in this case was respondent's failure to grant petitioner relief under section 6013(e). During the pendency of the case, Congress repealed section 6013(e) and enacted section 6015 as a substitute. The parties subsequently filed additional memoranda addressing the effect of new section 6015 on the instant case. The parties agree that section 6015, rather than section 6013(e), applies to the proceedings, and respondent has conceded that petitioner should be treated as having made any elections she may be eligible to make under section 6015 as if made in the petition.

                    FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and attached exhibits. At the time of filing the petition, petitioner resided in Washington, D.C. Her husband, petitioner Herbert L. Mitchell (Mr. Mitchell), is deceased. The Mitchells had been married for 28 years prior to Mr. Mitchell's death in March 1992 and had raised four children. Petitioner worked in

---

[1] References to sec. 6015 are to that section as added to the Internal Revenue Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201, 112 Stat. 685, 734. All other section references are to the Internal Revenue Code in effect for the year in issue.

the District of Columbia school system for 20 years, as a teacher and a counselor. Additionally, for 38 years, she operated a beauty salon, which employed one other person, who tended the salon while petitioner was working at the school. Petitioner did not maintain the beauty salon's books or payroll personally; instead, she engaged others to do so.

At the time of his death, Mr. Mitchell was a teacher and the Director of Federal Programs for the Charles County, Maryland, Board of Education. Mr. Mitchell managed the family's finances. He made the decisions with respect to major purchases and investments, paid the bills, and engaged an adviser to help him prepare the tax returns.

At the beginning of 1991, petitioner and Mr. Mitchell had three children in college and a fourth living at home. They were paying tuition and other expenses of the children in college. They were barely able to pay the family's bills. Their house was in need of substantial repairs.

Mr. Mitchell had been a member of the Teachers' Retirement System of the State of Maryland (Retirement System) until he transferred to the Teachers' Pension System (Pension System). The Retirement System is a qualified defined benefit plan under section 401(a) requiring mandatory nondeductible employee contributions, and the trust maintained as a part of the plan is exempt from taxes under section 501(a). The State of Maryland

also maintained the Pension System, another qualified defined benefit plan under section 401(a), and the trust maintained under that plan is also tax exempt under section 501(a).

Sometime in early 1991 Mr. Mitchell became interested in transferring from the Retirement System to the Pension System. He contacted the Maryland State Retirement and Pension Systems requesting an estimate of the amount of a refund he would receive upon such a transfer. The letter he received in response to his request, dated April 25, 1991, informed Mr. Mitchell that the estimated transfer refund would be $666,191.28. The letter noted that this refund would be "subject to taxation when received". The letter further stated that the Internal Revenue Service had ruled that the transfer refund was not eligible for a rollover into another eligible retirement plan either as a partial distribution or as a lump sum distribution. In addition, the letter advised Mr. Mitchell that he should review the tax consequences of receiving the transfer refund with his tax adviser or with the Internal Revenue Service. Petitioner did not see this letter.

On May 23, 1991, Mr. Mitchell elected to transfer from the Retirement System to the Pension System. As a result, he received a transfer refund distribution in the form of two checks, dated June 30, 1991, totaling $666,564.51. He initially deposited these checks into a bank and later invested the

proceeds in U.S. Treasury securities.  He did not roll over the proceeds into an Individual Retirement Account (IRA).  Petitioner and Mr. Mitchell received two Forms 1099-R from the State of Maryland indicating that the taxable portion of the transfer refund distribution was $629,083.14.  Petitioner was aware of the timing and amount of the transfer refund distribution and knew that Mr. Mitchell had purchased Treasury securities with the proceeds.

In January 1992, and for approximately 5 months thereafter, petitioner was suffering from shingles, the severity of which caused her to be bedridden at various times and absent from work for extended periods.  In March of 1992, Mr. Mitchell died suddenly as the result of a pulmonary embolism.  Sometime shortly after April 15, 1992, petitioner contacted Mr. Emerson Browne, the family's longtime tax adviser, concerning the preparation of a 1991 Federal income tax return.  She provided Mr. Browne with the records she could find, including the Forms 1099-R issued by the State of Maryland with respect to the transfer refund distribution.  She did not find, and therefore did not provide to Mr. Browne, the letter from the Maryland State Retirement and Pension Systems that had advised Mr. Mitchell that the transfer refund was potentially subject to taxation whether rolled over or not.

Not having seen this letter, Mr. Browne believed that in order to avoid current tax on the transfer refund distribution, Mr. Mitchell should have rolled it over within 60 days of the distribution into an eligible retirement plan, such as an IRA. He learned from petitioner that this had not been done.

Notwithstanding the failure to execute a timely rollover, Mr. Browne advised petitioner to effect a rollover by opening IRA's with the proceeds from the distribution.  He did not advise her that a rollover would be ineffective because untimely; rather, he told her to roll over the proceeds and referred her to a financial adviser for that purpose.  At the end of June 1992, with the assistance of the financial adviser recommended to her by Mr. Browne, petitioner sold the Treasury securities and opened four separate IRA's--two with initial investments of $130,000, and two more in the initial amount of $97,500, or a total of $455,000.  She also placed $162,500 in a non-IRA account with an investment service, bringing her total amount invested, including the IRA's, to $617,500.

In June or July 1992, Mr. Browne prepared a joint 1991 Federal income tax return on behalf of petitioner and her deceased husband.  The return reflected the receipt of the transfer refund distribution of $666,564.41.  The return as filed included Forms 1099-R issued by the State of Maryland reflecting that $629,083.14 of the transfer refund was fully taxable.

However, the return itself indicated that only $1,083.14 of the distribution was taxable. An attached schedule showed tax-free rollover treatment of $628,000 as invested in a qualified plan.

At the time she signed the return, petitioner did not understand the tax consequences of the transfer refund distribution or the purpose of the rollover she was advised to effect. She did not ask why a relatively small amount of the entire distribution was taxable. She relied upon Mr. Browne, her tax adviser, in concluding that the amount of the distribution treated as taxable on the return was correct. When she signed the return, she was not aware that the treatment of the distribution thereon was incorrect. She was not aware that her failure to treat $629,083.14 of the distribution as taxable income would give rise to a deficiency.

After signing the return, petitioner made expenditures from the various IRA accounts she had created with the proceeds of the distribution. Among other things, she made repairs and improvements to her residence; she paid down the mortgage; she paid her family's medical bills; she made gifts to her children and her mother; and she paid off her children's college loans and credit card balances for various family members. Her spending over the 3 years 1992 through 1994 totaled more than $441,000. She also established a trust for her children in the amount of $132,000.

During the examination and appeals phase of the instant case, petitioner submitted to respondent a copy of the previously filed joint 1991 Federal income tax return. However, the copy included a counterfeit Form 1099-R, prepared by Mr. Browne but purporting to be from the State of Maryland, indicating that only $709.96 of the transfer refund distribution was taxable.

## OPINION

The question before us is whether petitioner is entitled to relief from joint and several liability under section 6015, commonly referred to as innocent spouse relief. The parties do not dispute that $629,083.14 of the transfer refund must be included in income. Petitioner seeks relief under section 6015(b), (c), and (f) from the liability for tax attributable to the failure to include in income the taxable portion of the transfer refund distribution. We hold that she is not entitled to such relief.

In our recent Court-reviewed case, <u>Cheshire v. Commissioner</u>, 115 T.C. ___ (2000), we discussed the history of old section 6013 and new section 6015 in detail, and we do not repeat that discussion here.

Section 6015(b)(1) provides as follows:

> (1) In general.--Under procedures prescribed by the Secretary, if--
>
> > (A) a joint return has been made for a taxable year;

(B) on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of subparagraphs (A) through (E) are stated in the conjunctive; that is, a taxpayer must satisfy all of them to be entitled to relief under section 6015(b)(1).  There is no dispute in the instant case that petitioner satisfies (A) and (E); that is, that she made a joint return with her husband and that an appropriate election for relief has been made.  Respondent, however, contends that petitioner fails to satisfy subparagraphs (B), (C), and (D).  In accordance with Cheshire v. Commissioner, supra, we find that she does not satisfy subparagraph (C).

Cheshire, like the instance case, involved omitted income. In that case, the taxpayer's spouse received, and failed to report, retirement distribution proceeds.  The taxpayer was aware of the receipt, and amount, of the distribution.  We held that a taxpayer who has actual knowledge of the underlying transaction, such as the fact of the receipt of income and the amount thereof, does not satisfy the requirement set out in section 6015(b)(1)(C).  See Cheshire v. Commissioner, supra at ___ (slip op. at 16).  In the instant case, petitioner had actual knowledge of the underlying transaction; she was aware that the distribution had been received, and she was aware of the amount. Thus, under the standard established in Cheshire, she does not satisfy section 6015(b)(1)(C).  Because petitioner does not satisfy section 6015(b)(1)(C), we need not address whether she satisfies section 6015(b)(1)(B) or (D); she is not entitled to relief under section 6015(b).[2]

The statute offers a second opportunity for relief, in section 6015(c)(1), which provides as follows:

> (1) In general.--Except as provided in this subsection, if an individual who has made a joint return for any taxable year elects the application of this subsection, the individual's liability for any deficiency which is assessed with respect to the return shall not exceed the portion of such deficiency

---

[2] Because petitioner knew about the entire transfer refund distribution, she also is not entitled to an apportionment of relief under sec. 6015(b)(2).

properly allocable to the individual under subsection (d).

Thus, section 6015(c)(1) allows a taxpayer who is eligible and so elects to limit his or her liability to that portion of a deficiency that is "properly allocable to" the taxpayer as provided in section 6015(d). There is no dispute that no portion of the deficiency would be properly allocable to petitioner under section 6015(d). The dispute here is whether petitioner may elect the application of section 6015(c). Section 6015(c)(3) lists the criteria for electing the application of subsection (c). Section 6015(c)(3)(A) and (B) lay out eligibility and timing requirements for the election; respondent has conceded that petitioner satisfies these requirements.[3]

The dispute in this case centers on subparagraph (C), which provides as follows:

> (C) Election not valid with respect to certain deficiencies.--If the Secretary demonstrates that an individual making an election under this subsection had actual knowledge, at the time such individual signed the return, of any item giving rise to a deficiency (or portion thereof) which is not allocable to such individual under subsection (d), such election shall not apply to such deficiency (or portion). This subparagraph shall not apply where the individual with actual knowledge establishes that such individual signed the return under duress.

---

[3] Respondent concedes petitioner meets the requirement of sec. 6015(c)(3)(A)(i)(I) as a result of Mr. Mitchell's death and that an election should be deemed to have been made in the petition.

Thus, we are faced with the same question under section 6015(c) that we addressed in Cheshire; namely, whether respondent has demonstrated[4] that petitioner had "actual knowledge * * * of any item giving rise to a deficiency" within the meaning of section 6015(c)(3)(C). In Cheshire, we held that section 6015(c)(3)(C) does not require the Commissioner to show that the electing spouse had knowledge of the tax consequences arising from the item giving rise to the deficiency or that the item reported on the return was incorrect. Rather, "actual knowledge" for purposes of section 6015(c)(3)(C):

> is an actual and clear awareness (as opposed to reason to know) of the existence of an item which gives rise to the deficiency (or portion thereof). In the case of omitted income * * *, the electing spouse must have an actual and clear awareness of the omitted income. * * * [Cheshire v. Commissioner, supra at ___; fn. ref. omitted (slip op. at 19).]

In the instant case, petitioner had an actual and clear awareness of the omitted income--she knew when the transfer refund distribution was received and the amount of the distribution. Thus, despite the fact that petitioner was not aware of the tax consequences arising from the transfer refund distribution, or that her tax return was incorrect,[5] under our

---

[4] We note that in general under sec. 6015(c) the taxpayer has the burden of proof, see sec. 6015(c)(2), but for purposes of this provision, the Commissioner has the burden of proof, see id.

[5] Petitioner and Mr. Browne gave conflicting testimony
(continued...)

standard in <u>Cheshire</u> she does not qualify for relief pursuant to section 6015(c).

The final opportunity for relief under the statute lies in section 6015(f), which provides as follows:

> (f) Equitable Relief.--Under procedures prescribed by the Secretary, if-
>
>> (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either); and
>>
>> (2) relief is not available to such individual under subsection (b) or (c),
>
> the Secretary may relieve such individual of such liability.

We have jurisdiction to review, for abuse of discretion, the Commissioner's denial of relief under this subsection. See <u>Butler v. Commissioner</u>, 114 T.C. 276, 292 (2000); see also <u>Fernandez v. Commissioner</u>, 114 T.C. 324 (2000). In this case, petitioner significantly benefited from the omitted income. See <u>Kistner v. Commissioner</u>, T.C. Memo. 1995-66 (cited in <u>Butler v. Commissioner</u>, <u>supra</u> at 291). Among other things, she made

---

[5](...continued) concerning whether Mr. Browne advised petitioner that Mr. Mitchell's failure to effect a rollover of the transfer refund distribution within 60 days of receipt could produce adverse tax consequences. On the basis of the demeanor evidence, as well as Mr. Browne's apparent involvement in the preparation of a counterfeit Form 1099 to be submitted to respondent's agents, we find petitioner's version of events more credible and conclude that she had no knowledge that her 1991 return when signed was incorrect.

repairs and improvements to her residence; she paid down the mortgage; she paid her and Mr. Mitchell's medical bills; and she paid her children's loans and college expenses.  She also established a trust for her children in the amount of $132,000.  Her spending over the 3 years 1992 through 1994, including the trust fund, totaled more than $570,000.  In short, she used the money from the transfer refund to the considerable benefit of herself and her family.  These expenditures, while no doubt generous and well intentioned, nevertheless indicate the receipt of income far in excess of that previously available as normal support.  See Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979) (cited in Butler v. Commissioner, supra at 291).  We therefore conclude that respondent did not abuse his discretion in denying petitioner relief under section 6015(f).

To reflect the foregoing,

Decision will be entered
for respondent.